O

JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| HOME DEPOT U.S.A., INC., | ) | Case No. CV 18-03051 DDP (JCx) |
| Plaintiff, | )<br>) | **ORDER GRANTING DEFENDANT NATIONAL UNION FIRE INSURANCE COMPANY OF** |
| v. | )<br>) | **PITTSBURGH, PA'S MOTION FOR SUMMARY JUDGMENT** |
| TWIN CITY FIRE INSURANCE COMPANY, et al., | )<br>) | |
| Defendants. | )<br>) | [Dkt. 97] |

Presently before the court is Defendant National Union Fire Insurance Company of Pittsburgh, Pa ("National Union")'s Motion for Summary Judgment. Having considered the submissions of the parties and heard oral argument, the court grants the motion and adopts the following Order.

**I. Background**

Plaintiff Home Depot, U.S.A., Inc. ("Home Depot") sells products manufactured by nonparty Woodstream Corporation ("Woodstream"), including the Victor Electronic Model m240 rat trap. On or about November 11, 2013, Home Depot customer Cheyenne Angle ("Angle") was injured in a Home Depot store while examining a Model m240 trap ("the trap.") (Dkt. 1 Complaint ¶ 9.)

Battery-operated rat traps, such as the Model m240, are supplied to Home Depot without batteries. (MSJ Ex. 34, p.2.)  The trap Angle handled, however, was placed on the shelf with batteries installed. While holding the trap inside the store, Angle placed his fingers inside the trap and suffered an electric shock.  Angle and Home Depot employee Alex Pilat ("Pilat") observed that the trap's packaging appeared to be worn, leading Pilat to conclude that a customer had returned the trap with batteries installed and the trap was then re-stocked in that condition.

Within one week of the incident, Home Depot was made aware that Angle claimed to have been diagnosed with nerve damage, and that he intended to make a claim against Home Depot.  (MSJ Ex. 59 at 4-5.)  In June 2014, Home Depot received a letter from Angle's counsel suggesting that Home Depot was negligent in placing the trap back on the shelf with batteries installed, and raising the possibility that Angle had permanent nerve damage.  (MSJ Ex. 30 at 1.)  Angle filed suit against Home Depot in November 2015 and served Home Depot with the complaint in February 2016.

Woodstream, the trap manufacturer, was the named insured on (1) a primary $1 million products liability insurance policy issued by Defendant Twin City Fire Insurance Company ("Twin City") and (2) an excess policy issued by movant and Defendant National Union. The Twin City policy covered Woodstream's vendors, subject to certain additional exclusions not applicable to Woodstream itself. The National Union excess policy also covered vendors, under the same terms as the underlying Twin City policy.

Although Angle's suit against Home Depot alleged both that Home Depot was negligent and that the trap's design was defective,

2

Home Depot's in-house counsel classified the suit as a "core matter," as opposed to a "closed box defect" case that might have been suitable for tender to a third party.  (MSJ Ex. 61.) Subsequently retained outside counsel suggested that Home Depot tender the matter to Woodstream, but Home Depot declined, and proceeded to litigate the matter itself.

Although Home Depot initially designated an electrical engineer as an expert, Home Depot withdrew that expert once it became clear that Home Depot's retained expert (1) could not dispute that the trap could have caused Angle's injuries and (2) agreed with Angle's expert that the trap was defectively designed. (SGD 36.)  Home Depot did not conduct an independent medical examination of Angle.  Home Depot's counsel valued Angle's suit at up to $100,000.  Approximately three weeks before trial, Home Depot obtained new outside counsel.  Less than one week later, on May 8, 2017, new counsel valued the case at $4-6 million, and recommended that Home Depot consider a settlement in the $3-5 million range.

Soon thereafter, on May 12, Home Depot tendered the case to Twin City.  Home Depot notified National Union on May 18, four days before a scheduled mediation and eight days before trial.  After the mediation, and after the trial was continued, Home Depot rejected a $5.5 million settlement demand from Angle and agreed to binding arbitration.  As part of the stipulation to arbitrate, Home Depot agreed to pay Angle no less than $3 million and no more than $9 million.  The arbitrator ultimately found in Angle's favor and awarded him over $12 million.

Home Depot then demanded that National Union help fund the $9 million award to Angle.  National Union declined coverage, citing

Home Depot's untimely notice to National Union and coverage exclusions in the Twin City policy. Home Depot then filed the instant action, alleging breach of contract and bad faith and seeking a declaration of coverage. National Union now moves for summary judgment.

**II. Legal Standard**

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). All reasonable inferences from the evidence must be drawn in favor of the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 242 (1986). If the moving party does not bear the burden of proof at trial, it is entitled to summary judgment if it can demonstrate that "there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 323.

Once the moving party meets its burden, the burden shifts to the nonmoving party opposing the motion, who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. Summary judgment is warranted if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on

4

which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. There is no genuine issue of fact "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

It is not the court's task "to scour the record in search of a genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275, 1278 (9th Cir. 1996). Counsel have an obligation to lay out their support clearly. Carmen v. San Francisco Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001). The court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposition papers with adequate references so that it could conveniently be found." Id.

**III. Discussion**

A. Timely Notice

Although Home Depot knew as early as 2013 that Angle would be filing some type of claim, and was served with Angle's complaint in early 2016, Home Depot did not notify National Union of Angle's injury or claims until days before trial in May 2017. National Union contends that it was prejudiced by this unreasonably late notice, which, National Union argues, precludes coverage under the National Union policy.

There is no dispute that the National Union policy requires insureds to provide National Union with notice "as soon as

5

practicable of an Occurrence that may result in a claim or Suit under this policy." (Ex. 15 at 19.) The notice provision provides further that "[i]f a claim or suit is brought [,and] is reasonably likely to involve this policy, [the insured] must notify [National Union] in writing as soon as practicable." (Id.) Home Depot argues that its May 2017 notice to National Union comported with the policy's notice requirements because there is no evidence that, prior to May 2017, Home Depot had any reason to believe that Angle's claim would exceed $1 million, thus exhausting the Twin City primary policy and potentially implicating the National Union excess policy. (Opposition at 13-14.)

This argument is hard to square with the evidence in the record. Although outside counsel's initial valuation report, completed before the close of discovery, estimated a case value of only $100,000, that same report indicated that Angle himself expected an "eight figure" settlement, while Angle's counsel suggested that the case was "a low seven-figure case."[1] (MSJ, Ex. 32 at 8.) Home Depot was aware that (1) Angle, who was in his thirties and had a family, was claiming "a moderate, long-term neurological condition," and would likely present evidence of "prolonged and acute suffering, along with depression and anxiety" in addition to loss of future earnings, (2) Angle's expert would attribute all symptoms to electrical shock, and (3) Home Depot was "likely" liable. (Id. at 6, 8.) Although these circumstances might not necessarily have resulted in a settlement or verdict over

---

[1] The same outside counsel for Home Depot had earlier, in March 2016, recommended that Home Depot tender the matter to Woodstream, albeit not for any valuation-related reason. (MSJ Ex. 54 at 21-22.)

$1 million, they certainly created at least a reasonable likelihood of such an outcome. Furthermore, although only a "reasonable likelihood" would have triggered Home Depot's obligation to provide written notice to National Union, Home Depot was required to provide some notice as soon as it became apparent that Angle's claim "may" eventually implicate the National Union policy. No reasonable trier of fact could conclude that, given the nature of Angle's claim, evidence, and expectations, Home Depot had no reason to believe the claim "may" exceed $1 million. Moreover, any lingering uncertainties on that score were the product of Home Depot's own failures. Home Depot failed to retain any expert who could have contradicted Angle's causation evidence, and did not conduct an independent medical evaluation that, regardless of its conclusion, would have clarified the extent of Home Depot's potential exposure. Having blithely buried its head in the sand, Home Depot cannot now credibly contend that the risk that Angle's claim would be worth more than $1 million was simply unknowable.

B. Prejudice

Having concluded that there is no genuine dispute as to Home Depot's failure to give adequate notice, the court turns to the question of prejudice. "California's notice-prejudice rule requires an insurer to prove that the insured's late notice of a claim has substantially prejudiced [the insurer's] ability to investigate and negotiate payment for the insured's claim. A finding of substantial prejudice will generally excuse the insurer from its contractual obligations under the insurance policy . . . ." Pitzer Coll. v. Indian Harbor Ins. Co., 8 Cal. 5th 93, 101 (2019). "[P]rejudice is not established merely because the late

7

notice prevented the insurer from contemporaneously investigating the claim, nor does it arise from the mere denial of the opportunity to make an early settlement of the claim." Ins. Co. of State of Pennsylvania v. Associated Int'l Ins. Co., 922 F.2d 516, 524 (9th Cir. 1990) (internal alternations, quotation marks, and citation omitted). "[U]nder California case law, the only prejudice sufficient to allow an insurer to avoid liability based on late notice is found in those cases where the insurer actually demonstrated that there was a substantial likelihood that it could have either defeated the underlying claim against its insured, or settled the case for a smaller sum than that for which its insured ultimately settled the claim." Id. (citing Northwestern Title Sec. Co. v. Flack, 6 Cal. App. 3d 134, 143 (1970); see also Shell Oil Co. v. Winterthur Swiss Ins. Co., 12 Cal. App. 4th 715, 763 (1993) ("In order to demonstrate actual, substantial prejudice from lack of timely notice, an insurer must show it lost something that would have changed the handling of the underlying claim.  If the insurer asserts that the underlying claim is not a covered occurrence or is excluded from basic coverage, then earlier notice would only result in earlier denial of coverage.").

"[A]lthough the issue of prejudice is ordinarily one of fact, it may be established as a matter of law by the facts proved." Flack, 6 Cal.App.3d at 141.  Here, as discussed above, there is evidence to suggest that, with timely notice, National Union might have been able to conduct a more comprehensive investigation than Home Depot did, or to settle Angle's claims for less than the amount ultimately awarded.  The record does not, however, compel such a conclusion.  The threshold for a showing of prejudice as a

8

matter of law is high. In Belz v. Clarendon Am. Ins. Co., 158 Cal. App. 4th 615 (2007), for example, an insurer never received notice from its insured, and only learned of a claim against him after default had already been entered against him. Belz, 158 Cal. App. 4th at 622. Notwithstanding the lack of any opportunity for the insurer to investigate the claim, the Belz court reversed the trial court's grant of summary judgment in the insurer's favor, holding that the insurer had failed to show prejudice as a matter of law. Id. at 633. This Court acknowledges that other courts in this circuit have occasionally found substantial prejudice as a matter of law under comparable circumstances, citing to the Ninth Circuit's unpublished disposition in Cybernet Ventures, Inc. v. Hartford Ins. Co. of the Midwest, 168 F. App'x 850 (9th Cir. 2006). See, e.g., Century Sur. Co. v. Visemer De Gelt, LLC, No. 211CV42220DWFFMX, 2012 WL 13008730, at *5 (C.D. Cal. Feb. 17, 2012); Travelers Prop. v. Centex Homes, No. C 10-02757 CRB, 2011 WL 1225982, at *7 (N.D. Cal. Apr. 1, 2011). The Ninth Circuit subsequently clarified, however, that such reliance upon the Cybernet disposition is misplaced. Landmark Am. Ins. Co. v. Taisei Constr. Corp., 854 F. App'x 854, 856 (9th Cir. 2021) (unpublished disposition). "The issue of substantial prejudice is one of fact to be resolved by the trial court in the first instance." Id., (citing Flack, 6 Cal. App. 3d at 141). "Summary judgment cannot properly be based on [] presumptions." Id. Here, although National Union may be able to demonstrate at trial that it was actually prejudiced by Home Depot's late notice, it has not made that showing as a matter of law at this stage of proceedings.

    C.    Inspection Exclusion

9

The underlying Twin City policy excludes "any failure to make such inspections . . . as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the [Woodstream] products." (MSJ Ex. 16.) National Union asserts that the trap that injured Angle was only restocked on the Home Depot shelf because Home Depot failed to follow its own inspection procedures, and thus the inspection exclusion applies.

Woodstream's person most knowledgeable testified that when a consumer returns a Woodstream product to Home Depot, Home Depot is not required to return the item to Woodstream. (MSJ Ex. 15 at 26.) Instead, Home Depot is "supposed to" destroy the product and then seek a credit from Woodstream. (Id. at 26-27.) Between 2010 and 2014, Woodstream credited Home Depot for 13,819 rat traps. Although National Union contends that Home Depot's agreement with Woodstream required the former to destroy all returned rat traps, the evidence in the record does not support such a conclusion beyond dispute. Lawrence Cook, the manager of the Home Depot store where Angle was injured, testified that whether a returned item is placed back on the shelf "depends on how - - once we figure out how it's returned, it depends on what it is. If it's in saleable condition like new, then, yeah, it can go back on the shelf." (MSJ Ex. 49 at 30.) That testimony is consistent with evidence regarding Home Depot's standard operating procedure for returned merchandise, which states that "[a]ll returned merchandise must be inspected . . .. The Returns Associate must ensure that all returned merchandise sent to the sales floor is unused . . . .. The appropriate department Sales Associate rechecks the merchandise
10

before making it available for resale. If the merchandise is not salable, [designate the item for return to vendor.]" (Declaration of Chris J. Middleton, Ex. A at 5.) National Union has not, therefore, demonstrated beyond dispute that Home Depot failed to follow an inspection policy that would have required the destruction of a returned trap.

Regardless whether Home Depot was required to destroy a returned trap, however, the inspection exclusion applies if Home Depot failed to conduct the type of inspection it "normally undertakes to make in the usual course of business." An initial question, therefore, is whether Home Depot normally undertakes to conduct any kind of inspection. The answer is yes. As stated above, Home Depot's standard procedures require that all returned merchandise be inspected to "ensure" that it is in unused condition, and that such merchandise only be sent to the sales floor if that condition is met. Indeed, standard Home Depot procedures dictate that two different employees, the Returns Associate and the department Sales Associate, check merchandise to "ensure" that it is unused prior to placing it back on the shelf for resale.

National Union argues that Home Depot could not possibly have followed its own standard inspection procedures because, if it had, then the rat trap would not have been placed back on the shelf in used, energized, unsalable condition. In response, Home Depot points to the testimony of its representative, Kimberly Dobbs, who stated that "a visual inspection is done" on a product to determine whether that product can be resold. (MSJ Ex. 52 at 76.) Home Depot contends that such an inspection would not necessarily have

11

revealed whether the trap in question here had batteries inside. Thus, Home Depot concludes, the fact that an energized trap was placed on the shelf for re-sale does not establish that Home Depot failed to inspect the returned trap.

This argument is not persuasive. There is no indication in the record that Home Depot's standard operating procedure permits, let alone instructs, associates to conduct only a visual inspection of returned products. Indeed, such a practice would appear incompatible with store policy requiring employees to "ensure that all returned merchandise sent to the sales floor is unused." Moreover, given the wide range of potentially dangerous products sold by Home Depot, the assertion that associates conduct a purely visual inspection of returned items strains credulity. If true, virtually every Home Depot store is all but certain to contain products that, although visually indistinguishable from inoperable versions in safe condition, are in fact energized, gassed up, loaded, or otherwise capable of inflicting grievous harm upon unsuspecting shoppers or purchasers. Put differently, Home Depot employees could not possibly "ensure that all returned merchandise sent to the sales floor is unused" and in salable condition if, as Home Depot now suggests, employees do no more than conduct a purely visual inspection.

The notion that Home Depot's usual practice is limited to visual inspections also conflicts with the testimony of numerous Home Depot employees and representatives. Store Manager Cook, for example, testified that if a rat trap were returned by a customer, Cook would expect a Home Depot employee to make sure that there were no batteries inside. (Id. at 32.) Michael Weinman, a higher-

12

level Home Depot manager, testified that return associates can determine whether a product is used either by asking the customer or by inspecting the returned product, and that he too "would expect" a used rat trap to be designated for return to Woodstream. (MSJ Ex. 51 at 30.)  Weinman further testified that he would assume that a product that was sold without batteries but returned with batteries had been used, and that an inspection would reveal whether power was on when the product was returned.  (Id. at 33.) Ms. Dobbs, the representative who testified that "a visual inspection is done," also testified that Home Depot employees "should know" that rat traps are not sold with batteries, that Home Depot's policy is not to place powered products on the shelf, and that it would therefore be important to inspect a returned trap and check for batteries.  (Id. at 106, 109, 111).  These assumptions and expectations would be totally unrealistic if, as Home Depot now asserts, employees only conduct visual inspections of returned merchandise.

 The record indicates that it was Home Depot's common, sensible practice to "ensure that all returned merchandise sent to the sales floor is unused" and in salable condition.  Thus, the rat trap in question here could not have ended up on the shelf absent a failure to conduct a reasonable, typical inspection.  Accordingly, the inspection exclusion applies, and Angle's claim against Home Depot is not covered under the National Union excess policy.[2]

---

[2] Having so concluded, the court need not reach the question whether the exception to the repackaging exclusion applies when a product is removed from its packaging, altered, and then placed back into its original box.

13

**IV. Conclusion**

For the reasons stated above, National Union's Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.

Dated: January 31, 2022

DEAN D. PREGERSON
United States District Judge